# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **SILT SAVER, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Civil Action No. 1:16-cv-01137-SCJ** |
| **DENNY HASTINGS d/b/a** | ) | |
| **FRIENDLY ENVIRONMENT and** | ) | |
| **ATLANTIC CONSTRUCTION** | ) | |
| **FABRICS, INC., a Virginia** | ) | |
| **corporation, d/b/a ACF** | ) | |
| **ENVIRONMENTAL, and KEVIN** | ) | |
| **B. WOLFE** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

I.   INTRODUCTION ................................................................1

II.  PRINCIPLES OF CLAIM CONSTRUCTION ...................................1

III. DISPUTED CLAIM TERMS ...................................................2

   A. "*Entangled*" and phrases including the term "*entangled*"..............................3

      1. Disputed Claim Term No. 1 – "*entangled*" (Claims 1, 18 & 23) ........................................................................3

      2. Disputed Claim Term No. 4 – "fabric comprising a *plurality of entangled polymer fibers*" (Claims 1 & 23) ...........................5

      3. Disputed Claim Term No. 6 – "reinforcing material or element … *secured with the entangled polymer fibers*" (Claim 1).......................................................................19

      4. Disputed Claim Term No. 12 – "reinforcing material *secured to the entangled polymer fibers*" (Claim 23) ...........................20

      5. Disputed Claim Term No. 9 – "the reinforcing material comprises a *polymer material entangled within the polymer fibers of the fabric*" (Claim 18) ................................................20

   B. Terms involving strength...............................................21

      1. Disputed Claim Term No. 2 – "*ultimate tensile strength*" (Claims 20, 24, 28 & 31) ....................................................21

      2. Disputed Claim Term No. 8 – "*ASTM D-4632*" (Claim 5) ...................24

      3. Disputed Claim Term No. 10 – "the reinforced silt retention sheet … has an *ultimate tensile strength ranging from about*

*100 lbs to 350 lbs in the warp direction*" (Claims 20, 24, 28 & 31) ..........................................................................26

4.   Disputed Claim Term No. 11 – "the reinforced silt retention sheet … has an *ultimate tensile strength ranging from about 75 lbs to 450 lbs in the fill direction*" (Claims 20, 24, 28 & 31) ..........................................................................26

5.   Disputed Claim Term No. 13 – "said reinforced silt retention sheet has … *a mullen burst strength ranging from about 150 to 450 lbs per square inch*" (Claim 31) ....................................30

C.   Additional Disputed Terms ........................................................31

1.   Disputed Claim Term No. 7 – "*arranged spaced*" (Claim 1)...................31

2.   Disputed Claim Term No. 3 – "*arranged above ground*" (Claims 1 & 23) ..........................................................................33

3.   Disputed Claim Term No. 5 – "*reinforcing material or element*" (Claim 1) ..........................................................34

# TABLE OF AUTHORITIES

## Cases

*ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ................... 4

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1341 (Fed. Cir. 2003) ..................................................................... 29

*AquaTex Indus., Inc. v. Techniche Sols.*, 419 F.3d 1374, 1380 (Fed. Cir. 2005) ................................................................. 18, 19

*Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ........................ 18

*Cat Tech LLC v. Tube-Master, Inc.*, 528 F.3d 871, 885 (Fed. Cir. 2008) ............................................................... 18

*Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1305-07 (Fed. Cir.2000) ........................................... 18

*Honeywell Intern., Inc. v. International Trade Comm'n*, 341 F.3d 1332, 1340 (Fed. Cir. 2003) ............................................. 29

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120, 2124 (2014) .......... 29, 33

*Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003) ....................................................... 33

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) ........................... 2, 4

## Statutes

35 U.S.C. § 112 ......................................................................... 29

# I.  <u>INTRODUCTION</u>

Denny Hastings d/b/a Friendly Environment ("Friendly Environment"), Atlantic Construction Fabrics, Inc., d/b/a ACF Environmental ("ACF"), and Kevin B. Wolfe (collectively, "Defendants") submit this brief in support of Defendants' proposed claim constructions.

U.S. Patent No. RE42,695 ("the '695 Patent") describes a reinforced silt retention sheet and systems for silt retention – "The reinforced silt retention sheet includes a non-woven fabric having a series of entangled polymer fibers with a reinforcing material secured within the fabric."  (Exhibit 1, '695 Patent, Abstract) The '695 Patent was the subject of a Reissue Proceeding at the USPTO (the "Reissue Proceeding") in which the patent owner amended several of the claims of its originally issued U.S. Patent No. 7,465,129 ("the '129 Patent") and added additional claims.  The parties have collectively identified a number of claim terms and phrases of the '695 Patent for construction and in particular claims 1, 5, 13-20, 22-24, 26, 28 and 31-34 ("the Asserted Claims")[1] (Doc. 61).

# II.  <u>PRINCIPLES OF CLAIM CONSTRUCTION</u>

Words of a claim are generally given their ordinary and customary meaning, which is the meaning that the term would have to a person of ordinary skill in the

---

[1] Plaintiff originally asserted Claims 29 and 30, but has withdrawn those claims.

pertinent art at the time of the invention.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).  The claims do not stand alone, however, and "must be read in view of the specification, of which they are a part."  *Id.* at 1315. The specification is "always highly relevant" to claim construction and is "the single best guide to the meaning of a disputed term."  *Id.*  Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, Courts look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean," including "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."  *Id.* at 1314.

## III.  **DISPUTED CLAIM TERMS**

Rather than addressing the claims in the order they appear in the Joint Claim Construction Chart Update ("Claim Chart") (Doc. 61), Defendants have grouped the terms into the following categories to provide context and assist in claim construction:  (1) "e*ntangled*" and phrases including the term "*entangled*"; (2) terms involving strength; and (3) additional disputed terms.  With respect to the "entangled" category, Plaintiff identified the word "*entangled*" alone as requiring

construction, although Defendants have identified four phrases where the term "*entangled*" is used as part of a larger phrase that requires construction, in context.

## A.    "*Entangled*" and phrases including the term "*entangled*"

A significant issue in this case involves the fact that the patent owner removed the word "*nonwoven*" from Claims 1 and 23 during the Reissue Proceeding, but retained the phrase "*plurality of entangled fibers*" when referring to the fabric that is used to make the claimed silt retention sheet.  Plaintiff proposes that it is only necessary to construe the meaning of the word "entangled".  Defendants propose that a proper construction must consider the full context in which the word "entangled" is used in the claims, as well as the description provided in the specification of the '695 Patent and its prosecution history. (hereinafter "Specification" and "Prosecution History")

### 1.    Disputed Claim Term No. 1 – "*entangled*" (Claims 1, 18 & 23)

| Plaintiff's Proposed Construction | Defendants Proposed Construction |
|---|---|
| "connected and not readily separated" | "to twist together or entwine into a confusing mass; snarl" |

The word "entangled" is used in Claims 1 and 23 to describe how the polymer fibers are arranged in the fabric of the claimed silt retention sheet:

> **Claim 1**:  "A reinforced silt retention sheet arranged above ground, for use in a silt management application, comprising: a flexible, water permeable, *fabric comprising a plurality of entangled polymer fibers*…"

> **Claim 23**:   "A reinforced silt retention sheet arranged above ground, for use in a silt management application, comprising: a flexible, water permeable, *geotextile fabric filter material* having a thickness of less than about 5 mm and *comprising a plurality of entangled polymer fibers*…"

Plaintiff's attempt to restrict construction to only the word "entangled" ignores the manner in which the word is used in the claims and is improper. "While certain terms may be at the center of the claim construction debate, the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms." *ACTV, Inc. v. Walt Disney Co*., 346 F.3d 1082, 1088 (Fed. Cir. 2003).   "We cannot look at the ordinary meaning of the term ... in a vacuum.  Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history." *Phillips* at 1313.

The Specification does not define the word "entangled".  However, in the instances where "entangled" appears in the Specification, it refers to **nonwoven** fabrics, as more fully described below.

Plaintiff's proposed construction, "*connected and not readily separated*", is not supported by the Specification or Prosecution History.   In fact, Plaintiff's expert, Dr. Sabit Adanur, testified that he created this definition:

> Q.   Did you come up with that definition?

A.   Yes.

Q.   So you were the first one to suggest that entangled meant connected and not readily separated?

A.   Yes.

(Exhibit 2, excerpts from deposition transcript of Dr. Adanur, at 76:6-12)

To the extent that the word "entangled" should be construed as part of the larger phrases that are recited in the claims, Defendants propose that the following dictionary definition is applicable:  "*to twist together or entwine into a confusing mass; snarl*" (Exhibit 3, American Heritage College Dictionary, p. 458)

**2.   Disputed Claim Term No. 4 – "fabric comprising a *plurality of entangled polymer fibers*" (Claims 1 & 23)**

| Plaintiff's Proposed Construction | Defendants Proposed Construction |
|---|---|
| No construction is necessary for "fabric" "comprising" "plurality" "polymer" or "fibers" – all of which have an ordinary meaning.  The term "entangled" should be construed as proposed by Silt Saver. | "fabric including multiple polymer fibers entangled with each other in a nonwoven manner"<br><br>"*Entangled*" means:  "to twist together or entwine into a confusing mass; snarl" |

a)   Specification of the '695 Patent

Every time the term "*entangled*" appears in the Specification, it is used in context of a nonwoven fabric (emphasis added):

The reinforced silt retention sheet includes a **non-woven** fabric having a series of **entangled** polymer fibers with a reinforcing material secured within the fabric.  (Ex. 1, Abstract)

Thus, the silt retention sheet may comprise a **nonwoven** fabric having a reinforcing element embedded within the **entangled nonwoven** fibers. (Ex. 1, col. 7, lines 38-40)

For example, the resulting structure may be subject to a mechanical **entanglement** process to enmesh the various layers of fiber and the reinforcing material. As a result, the reinforcing material is secured within the fibers by mechanical entrapment in the absence of thermal or adhesive bonding or fusing to or with the **nonwoven** fibers. (Ex. 1, col. 7, lines 49-55)

Thus, in one particular example, the system may include at least one wood stake, at least one fastener, for example, a staple, and a needlepunched spunbond polyester **nonwoven** fabric having a fiberglass scrim 616 entrapped and **entangled** with the fibers 618 without additional adhesive or mechanical bonding. (Ex. 1, col. 17, lines 1-6)

For example, where the reinforcing element is formed from a polymer or other material capable of softening in response to heat, the polymer used to form the **nonwoven** fibers may be selected such that the **nonwoven** fibers have a lower softening point than the reinforcing element. The structure then can be through air bonded or point bonded at a temperature above the softening point of the **entangled** polymeric fibers but below the softening point of the reinforcing element. (Ex. 1, col. 7, line 63 – col. 8, line 6)

Thus, by way of example and not by limitation, one example of a system according to this aspect may include a fabric comprising a wood stake, a wood lattice strip fastener support, a fastener, for example, a staple, and a needlepunched spunbond polyester **nonwoven** material having a fiberglass scrim 718 entrapped and **entangled** with the fibers 720 without any additional adhesive or mechanical bonding. (Ex. 1, col. 18, lines 37-43)

As used herein, '**needlepunching**' [defined col. 4, lines 56-63 as a process to form nonwoven fabrics] refers to a process of converting batts of loose staple or continuous fibers, or a combination of staple fibers and continuous fibers, into a coherent

> **nonwoven** fabric in which barbed needles are punched through the batt, thereby **entangling** the fibers.  (Ex. 1, col. 5, lines 50-55)

The Specification defines "fabric" as a genus, and "woven fabric" and "non-woven fabric" as species under that genus:

> As used herein, the term 'woven' refers to a fabric or material made or constructed by interlacing threads or strips of material or other elements into a whole. (Ex. 1, col. 4, lines 50-52)
>
> As used herein, the term 'nonwoven' material or fabric or web refers to a web having a structure of individual fibers or threads which are interlaid, but not in an identifiable manner as in a knitted fabric.  Nonwoven fabrics or webs have been formed from many processes including, but not limited to spunbonding processes, meltblowing processes, bonded carded web processes, felting processes, and needlepunching processes. (Ex. 1, col. 4, lines 56-63)

Every time the word "entangled" appears in the Specification it is part of the non-woven fabric species or a sub-species thereof.   In contrast, the Specification defines that the woven fabric species is "made or constructed by interlacing threads or strips of material or other elements into a whole." (Ex. 1, col. 4, lines 51-52)

The Genus/Species Chart, Exhibit 4, details the genus, species and sub-species as disclosed in the 'Specification.  Each time the word "entangled" appears in the Specification it has been included on the Genus/Species Chart.  All uses of

the term "entangled" are in respect to the nonwoven species or a subspecies thereof.

Examples of entangled polymer fibers can be seen in Figs. 4-9 of the '695 patent; Figs. 4 and 6 are reproduced below:



The Specification describes the entangled fibers shown in Figs. 4 and 6 as follows:

> FIG. 4 illustrates another example of a reinforced silt retention sheet according to the present invention.  In this embodiment, the silt retention sheet 210 is formed of a **nonwoven**, water-permeable web 212 composed of a suitable polymeric material. (Ex. 1, col. 9, lines 23-27; emphasis added)

> In the example shown in FIG. 6, the web 412 is composed of a **nonwoven** material, such as a spunbond polypropylene or polyester… (Ex. 1, col. 10, lines 21-24; emphasis added)

Plaintiff's own expert conceded that the Specification does not describe woven fabrics as containing entangled fibers (Ex. 2, 194:17-22):

> Q.   Am I correct that nowhere in the specification is there a discussion of a woven fabric containing entangled fibers?

8

A.   Not that I recall. I have to, again, look at, you know, every word, but I don't recall that it was the case.

The Specification distinguishes the nonwoven Sample S fence of the invention from a woven Type C Sample W fence:

> The properties and performance of an exemplary silt retention system (S) according to the present invention were evaluated to determine its sediment restraining properties and flow through rates relative to a commercially available Type C silt fence (W) control. (Ex. 1, col. 18, lines 50-54)

TABLE 3

|  | Sample W | Sample S |
| --- | --- | --- |
| General description | Woven polypropylene, style 2098, 28 EPI × 19 PPI | Fiberglass scrim (0.25 in. mesh) reinforced spunbond polyester (about 4-5 dpf) attached to stake using wood lattice fastener support strip |

As shown in Table 3 of the Specification, the "invention" sample is nonwoven spunbond polyester labeled "Sample S", while the "control" sample is woven polypropylene labeled "Sample W" (for woven).  (Ex. 1, Table 3 and col. 18, line 59 to col. 19, line 28)

b)    Prosecution History of the '695 Patent

During prosecution of the '695 Patent, the inventor, Mr. Singleton, distinguished his claimed silt retention fence over a prior art woven "Type C" silt retention fence "produced from non-calendered woven fabric constructed with monofilament yarns only":

9

> ***Notably, the claimed invention has been found to be an approved alternative to heavy gauge Type-C silt fencing*** *that necessarily requires a wire backing for support and the use of steel support posts, while the claimed invention can be used with wooden support posts and does not require a wire backing for additional support and comparable effectiveness.*

(Exhibit 5, July 12, 2009 Amendment and Response in Reissue, p. 19; emphasis added)

> 4. Attached herewith and identified as "Exhibit 1" is a copy of an evaluation of the reinforced silt retention sheet, which was produced in accordance with the construction of the reinforced silt retention recited by the claims of the current reissue application, conducted by Dr. Mark Risse, […]. As concluded by Dr. Risse in the evaluation attached as Exhibit 1, *the claimed reinforced silt retention sheet, identified as the "BSRF" in the evaluation, consistently removed greater amounts of sediment from the flow, and measured sediment removal efficiencies were uniformly higher for the BSRF than "Type C" silt fence, which is defined as a silt fence produced from a noncalendared **woven** fabric* constructed with monofilament yarns only […].

(Exhibit 6, Declaration of Earl R. Singleton Under 35 U.S.C. 1.132, p. 2, ¶4; emphasis added)

Thus, during prosecution of the '695 Patent, Mr. Singleton argued that the nonwoven BSRF fence of his claimed invention was patentable over conventional Type C silt fence made from **woven** fabrics.

Furthermore, the USPTO Examiner made clear that the phrase "**plurality of entangled fibers**" is inclusive of **nonwoven fabrics**, although the similar phrase **without the word "entangled"** includes **woven and nonwoven fabrics**. The first

USPTO Office Action of the Reissue Proceeding included the following

Restriction Requirement:

Election/Restrictions

1. This application contains claims directed to the following patentably distinct species:

Species A, the embodiment of a reinforced silt retention sheet comprising a *plurality of **entangled polymer fibers**, inclusive of **non-woven fabrics***; and

Species B, the embodiment of reinforced silt retention sheet comprising a *plurality of **polymer fibers**, inclusive of **woven and non-woven fabrics***.

(Exhibit 7, December 31, 2009 Office Action, p. 2; emphasis added)

  c)  <u>Extrinsic Evidence</u>

The textbook DESIGNING WITH GEOSYNTHETICS shows and describes the

differences between woven geotextiles and nonwoven geotextiles having entangled

polymer fibers.  Images of woven fabrics comprising two sets of orthogonally

interlaced monofilaments, and other images of non-woven fabrics comprising

entangled polymer fibers from this textbook, are reproduced below:



(Exhibit 8, R. M. Koerner, Designing With Geosynthetics (© 1997), p. 30; emphasis added)

Koerner further states:

> In the **needle-punching process**, the third and most common bonding, a fibrous web is introduced into a machine equipped with groups of specially designed needles. [...] It is either on the downstroke or the upstroke where the **entanglement** process occurs. Often the batt of fibers is carried into the needle-punching section of the machine on a lightweight support material or substrate.

(*Id.*, p. 3; emphasis added)

The WELLINGTON SEARS HANDBOOK OF INDUSTRIAL TEXTILES by Dr. Sabit Adanur, Plaintiff's expert, contains a chapter on the "Classification of Fabrics". In that Chapter, these diagrams depict the structure for woven and nonwoven fabrics:



(Exhibit 9, Adanur, Sabit, WELLINGTON SEARS HANDBOOK OF INDUSTRIAL TEXTILES, (©1995), p. 88)

In the Chapter entitled "nonwoven Fabrics," the Adanur book explains:

> The word nonwoven is not very descriptive in that, at best, it describes what fabric is not. **Nonwoven usually implies that the fabric has been formed by a procedure other than weaving, knitting braiding or tufting**. … A reasonable definition of a nonwoven fabric is a fabric made directly from a web of fiber or film, without the intermediate step of yarn manufacture (necessary for weaving, braiding, knitting or tufting).

(*Id*. at 141; emphasis added)

Further describing nonwoven products, the Adanur book states:  "Textiles normally use fibers which are an inch or more in length.  When flexible fibers of longer than an inch in length are suspended and stirred in water, they tend to become **entangled**."  (*Id*. at 146; emphasis added)

13

In describing fiber bonding, the Adanur book further explains:

> When fibers are laid down in a batt **without the interlacing provided by knitting or weaving**, the batt has little strength. The **entanglement of fibers**, or the addition of a bonding agent is necessary if strength is to be developed." **Fiber entanglement can be provided by** either **needlepunching** (Figure 4.75) or by hydroentanglement (Figure 4.76). In **needlepunching**, barbed needles are pushed through the web. The barbs catch fibers on the surface of the batt, and push them into the center, densifying the structure and **producing strength through entanglement**. An alternative to **mechanical entanglement to provide structural integrity to a nonwoven material is the addition of an adhesive** to bind the fibers together.

(*Id*. at 147-48; emphasis added)

Dr. Adanur goes on to describe the production of a nonwoven fabric by the mechanical bonding process: "Mechanical bonding is done by a needlepunching process. In this method thousands of barbed needles, attached to a board, are punched through the loose web and withdrawn, leaving filaments **entangled**." (*Id*. at 301; emphasis added)

In the textbook "THE GEOTEXTILES AND GEOMEMBRANES MANUAL" (Exhibit 10, p.7; emphasis added), it is stated:

> [I]t is first necessary to look at the major classification which makes the important distinction between woven and nonwoven geotextiles. As the name implies, **woven** geotextiles are made by traditional methods in which two orthogonal sets of elements are woven together, Figure 1.4. In contrast **nonwovens** are made from much finer elements, usually circular in cross-section, which are

14

laid down in a loose web and then bonded, usually by heat or mechanical **entanglement**, to produce a coherent fabric.

The photos shown below from this text (*Id.* at 7-8) also show the substantial morphological differences between woven and nonwoven geotextile fabrics:


Figure 1.4  A woven structure


Figure 1.5  A nonwoven structure

Defendants' expert, Dr. David Brookstein, reviewed the intrinsic and extrinsic evidence of record, including several textile textbooks, and came to the following conclusions:

> It is my opinion that the intrinsic evidence cited above and the extrinsic evidence cited above clearly, substantially and unequivocally support that 1) species and subspecies of nonwoven fabrics are made from entangled polymer fibers and that 2) species of woven fabrics are made from interlaced polymer fibers.  (Doc. 50, ¶ 63)

> Further, it is my opinion that one of ordinary skill in the art would understand that entangled polymer fibers are included in nonwoven fabrics species or subspecies and not included in woven fabric species.  (*Id.*, ¶ 64)

Plaintiff's own expert conceded that none of the extrinsic evidence he relied upon, or which was cited by Defendants' expert, supports his claim that multiple entangled polymer fibers exist in a woven fabric.  (Ex. 2, 198:12-18)

Dr. Adanur admitted that he never authored a document in which he referred to a woven fabric as including entangled polymer fibers before writing his report in this case.  (Ex. 2, 91:2-12)  He also admitted that none of the documents he relied upon described the interlacing of woven fabrics as being a type of entangling of the fibers.  (Ex. 2, 113:19-24)  Further, he did not recall using "entangled" as a word to describe a woven product before writing his report in this case (Ex. 2, 91:13-22).  Finally, he went back and looked at books he authored to see if he had ever referred to a woven fabric by using the word "entangled" as opposed to using the term "interlaced", and could not find any examples (Ex. 2, 92:4 – 93:11), nor did he find any such examples in all of the extrinsic evidence that he searched for and attached to his report.  (Ex. 2, 113:19-24)

In his published textbooks, Dr. Adanur referred to and used the word "entangled" with respect to the process of preparing a <u>nonwoven</u> fabric, but never used it with respect to a woven fabric, including in his textbook entitled "HANDBOOK OF WEAVING".  (Ex. 2, 100:1-11)

Dr. Adanur admitted that none of the literature he considered linked woven material with entangled polymer fibers (Ex. 2, 136:11 – 137:6):

> Q.   And in your report, you were specifically linking entangled to woven fabrics; correct?
>
> A.   Yes.

16

Q.   So that would have been significant in support of your
     opinion; correct?

A.   Yes.

[***]

Q.   You did not attach any literature to your report that identifies
     woven as being a subset of entangled?

A.   That's right.

Dr. Adanur further testified that "nonwovens are entangled", but "entangled"

is not conventionally used to describe woven fabrics (Ex. 2, 120:23 – 121:12):

Q.   And in your opinion, using the word "entangled" doesn't lead
     you, as one skilled in the art, to think of nonwoven products
     or nonwoven materials?

A.   It does. Nonwovens are entangled.

Q.   In fact, entangled is most often used in describing nonwoven
     products; right?

A.   That's a fair statement.

Q.   And rarely, if ever, used in describing a woven product;
     correct?

A.   Yes. Because there's a better word to describe the woven
     product, and that is interlacing.

Dr. Adanur also admitted that applying his construction to the term

"entangled" would render that term meaningless or superfluous (Ex.2, 111:22 –

112:10):

17

> Q.   So your opinion is the phrase or the term "entangled" is superfluous in the phrase "fabric comprising a plurality of entangled polymer fibers"?
>
> A.   Yes.  When you say "fabric," for a technical person, yeah, that -- that is understandable that it should be entangled.  But for a person in public, an ordinary person, it may be necessary.
>
> Q.   But you understand that the words of a patent are used to describe the invention of one skilled in the art, not to someone like me?
>
> A.   I think so.

Dr. Adanur's (and Plaintiff's) proposed construction should not be adopted by the Court, because it would render the term "entangled" meaningless.  Claims must be "interpreted with an eye toward giving effect to all terms in the claim." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006).  *Cat Tech LLC v. Tube-Master, Inc.*, 528 F.3d 871, 885 (Fed. Cir. 2008) (refusing to adopt construction that would render claim limitation meaningless); *Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1305-07 (Fed. Cir.2000) (refusing to adopt construction that would render claim language superfluous).

In *AquaTex Indus., Inc. v. Techniche Sols.*, 419 F.3d 1374, 1380 (Fed. Cir. 2005), the Federal Circuit considered whether the claim term "fiberfill batting material" should be construed to encompass only synthetic fibers or both synthetic and natural fibers.  The Court found that, based upon the teachings of the specification and consistent interpretations in industry publications, one of

ordinary skill in the textile manufacturing industry would understand that "fiberfill batting material" is made of synthetic or polyester fibers. *Id*. at 1381-82. Similarly in the present case, the Specification and Prosecution History, along with the extrinsic evidence of record, demonstrate that those skilled in the art would consistently understand that "entangled polymer fibers" are synonymous with **nonwoven** fabrics, and are **not** found in woven fabrics.

Defendants' proposed construction, "*fabric including multiple polymer fibers entangled with each other in a nonwoven manner*" is aligned with the Specification and Prosecution History, and clarifies that those skilled in the art would understand that "entangled polymer fibers" are only found in nonwoven fabrics. The extrinsic evidence, including multiple textbooks (some written by Plaintiff's expert), Dr. Brookstein's expert report (Doc. 50) and the testimony of Plaintiff's expert, all support Defendants' proposed construction.

### 3. Disputed Claim Term No. 6 – "reinforcing material or element … *secured with the entangled polymer fibers*" (Claim 1)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction is necessary for any term other than the term "entangled" as all other terms have an ordinary meaning. The term "entangled" should be construed as proposed by Silt Saver. | "*The entangled polymer fibers*" means "multiple polymer fibers entangled with each other in a non-woven manner" (as construed above). |
| Additional limitations relating to | "Secured *with*" means the "*reinforcing material or element*" (as construed above) is "attached to" |

| | |
|---|---|
| "non-woven manner" should not be added. | "*the* "*entangled polymer fibers*" (as construed above). |

See below.

### 4.   Disputed Claim Term No. 12 – "reinforcing material *secured to the entangled polymer fibers*" (Claim 23)

| Plaintiff's Proposed Construction | Defendants Proposed Construction |
|---|---|
| No construction is needed for any term other than the term "entangled" as all other terms have an ordinary meaning.   The term "entangled" should be construed to mean "connected and not readily separated".   Additional limitations relating to "non-woven manner" should not be added.<br><br>Substituting "attached to" for "secured to" adds nothing. | "*The* e*ntangled polymer fibers*" means "multiple polymer fibers entangled with each other in a non-woven manner" (as construed above).<br><br>"*Secured to*" means the "*the reinforcing material*" is "attached to" "*the entangled polymer fibers*" " (as construed above). |

See below.

### 5.   Disputed Claim Term No. 9 – "the reinforcing material comprises a *polymer material entangled within the polymer fibers of the fabric*" (Claim 18)

| Plaintiff's Proposed Construction | Defendants Proposed Construction |
|---|---|
| No construction is needed for any term other than the term "entangled." as all other terms have an ordinary meaning.   The term "entangled" should be construed as proposed by Silt Saver. | "*The polymer fibers of the fabric*" means "*the plurality of entangled polymer fibers*" (as construed above).<br><br>The "polymer material of the reinforcing material is embedded, entrapped and entangled within" "*the plurality of entangled polymer fibers*" (as construed above) of the fabric. |

In all of these disputed phrases, the "*reinforcing material or element*" is a separately recited feature of the claim that is different from, and in addition to, the previously recited feature of "*plurality of entangled fibers*" appearing earlier in the claim.  In accordance with their ordinary meaning, the claims require not only a fabric comprising a plurality of entangled fibers, but also a **separate** reinforcing material or element that is either *secured with* (Claim 1), *secured to* (Claim 23) or *entangled within* (Claim 18) the previously recited *entangled polymer fibers* of the fabric.  Defendants' proposed constructions are intended to clarify for the jury that the recited "*reinforcing material or element*" must be a separate feature from the "*plurality of entangled fibers*" of the fabric recited elsewhere in the claims.

## B.   <u>Terms involving strength</u>

Defendants believe that each of the identified phrases relating to the strength of the claimed reinforced silt retention sheet requires construction, because the Specification clearly describes only one generally accepted standard method of testing each type of strength recited in the claims, and absent a defined test method, the asserted claims are indefinite.

### 1.   Disputed Claim Term No. 2 – "*ultimate tensile strength*" (Claims 20, 24, 28 & 31)

| Plaintiff's Proposed Construction | Defendants Proposed Construction |
|---|---|
| "the tensile strength at which at least a portion of the fabric will fail" | "*Ultimate tensile strength*" is measured according to the ASTM D-4632 standard |

|  | test procedure and means "the maximum force applied to a reinforced silt retention sheet in a tensile test carried to rupture." |
|---|---|

a)   <u>Intrinsic evidence</u>

The Specification states that the ASTM D-4632 standard test is used to measure tensile strength:  "The reinforced silt retention fabric generally may have a tensile strength of at least about 100 lb in the warp (machine) direction ('warp tensile strength'), <u>as measured according to ASTM D-4632</u>."  (Ex. 1, col. 12, lines 31-34; emphasis added)

Table 3 in the Specification provides comparative tensile strength test results that were measured using the ASTM D-4632 standard test:

TABLE 3-continued

|  | Sample W | Sample S |
|---|---|---|
| Source | Willacoochee Industrial Fabrics (Willacoochee, GA) | Silt-Saver, Inc. (Conyers, GA) |
| Basis weight (osy) | 6.2 | 3.0 |
| Thickness (mm) | Not tested | 0.4 mm |
| Grab tensile (lb) (ASTM D-4632) | Warp (machine direction) - 300 Fill (cross direction) - 200 | Warp (machine direction) - 124 Fill (cross direction) - 88 |

Similarly, the Prosecution History confirms that ultimate tensile strength is measured by using the ASTM D-4632 standard test:

Grab tests using ASTM Standard D4632-91 (ASTM, 2003) were conducted on the silt-saver test fence material in both a wet and dry state.  A grab test is a tensile test in which the specimen is loaded until breaking.  (Exhibit 6, at R000586)

All of the intrinsic evidence demonstrates that tensile strength is to be measured in accordance with the ASTM D-4632 standard test.

b)   <u>Extrinsic evidence</u>

As set forth in Dr. Brookstein's expert report, "ultimate tensile strength" should be construed as "the maximum force applied to a reinforced silt retention sheet in a tensile test carried to rupture." (Doc. 50, ¶ 139) Specifically, one skilled in the art at the time of the invention would conduct a "grab test" using ASTM D-4632 standard to determine the "ultimate tensile strength." (*Id.*, ¶ 142)

Plaintiff's proposed construction (as explained by Plaintiff's expert) is that ultimate tensile strength does not refer to the strongest point, but rather the <u>weakest</u> point (Ex 2, 203:6-12) and further (*Id.* at 204:13-21):

> Q.   So you believe that the definition of "ultimate," which is greatest extreme or maximum, actually means the weakest point?   And that supports your position?
>
> A.   For the purpose of using the material or the product, yes. That is -- that is the first point that the material starts giving in.

Plaintiff's expert however conceded that when the patentee described "tensile strength" in the Specification, it was to be measured in accordance with ASTM D-4632. (Ex. 2, 217:25 – 218:4) He also conceded that the <u>only</u> test method for tensile strength that is discussed in the specification is ASTM D-4632. (Ex. 2, 219:4-8) Dr. Adanur further testified that one skilled in the art in 2002 would have understood that the generally accepted test for grab tensile strength in

the United States was ASTM D-4632. (Ex. 2, 219:21 – 220:25)  In fact, he testified

(Ex. 2, 223:14-21):

> Q.   One skilled in the art would understand that if you wanted to know the tensile strength of a geotextile material, you would use the ASTM D4632 grab tensile test?
>
> A.   Yeah. Because that simulates the field conditions better than the other tensile tests.

Plaintiff's proposed construction, in which no standard test needs to be

applied to determine the ultimate tensile strength, is not supported by the

Specification, Prosecution History or Plaintiff's expert.

### 2.   Disputed Claim Term No. 8 – "*ASTM D-4632*" (Claim 5)

| Plaintiff's Proposed Construction | Defendants Proposed Construction |
| --- | --- |
| ASTM D-4632 is a multi-page, complex standard with multiple subparts and instructions not susceptible to brief summary. | "*ASTM D-4632*" is a published standard test method for grab breaking load and elongation of geotextiles to determine the effective strength of a fabric using 4-inch wide fabric specimens that are gripped and pulled by jaws. The breaking load for multiple specimens is measured, and the average of the test values is used, without subtracting any standard deviation(s). |

Plaintiff did not propose a construction for ASTM D-4632.  Through its

expert, Plaintiff proposes that the term does not require construction because one

skilled in the art would know what it means.  (Ex. 2, 268:15-22)  However, Dr.

Adanur later conceded at his deposition that the term "ASTM D-4632" should not

go to the jury without explanation (Ex. 2, 270:4-10), and that it can be summarized

for the jury (Ex. 2, 270:11 – 271:18):

> Q.  What do you mean when you say that it doesn't require construction?
>
> A.  Well, ASTM 4632 is a well-written, highly sophisticated test method, and the person that is going to do the test method either should know it or should read it very carefully to be able to use it.  Based on these four or five lines, the jury could not understand really the test method anyway.
>
> Q.  So you're saying that ASTM D4632 cannot be summarized to a jury so that they could understand it?
>
> MR. WATKINS: Objection.  You may answer subject to the objection.
>
> A.  It can be summarized, I assume, but it would not cover the test method that is -- that is there.  I mean, the jury would not really -- cannot make it -- I believe, if they aren't familiar with that, cannot really make a judgment about or -- you know, cannot really fully understand that test method by just using -- reading those few lines.
>
> Q.  So I'm talking about any type of description. Is there a description that could be drafted that would make ASTM D4632 understandable to a jury?
>
> MR. WATKINS: Objection. You may answer subject to the objection.
>
> A.  There could be, but it would be a lot longer than this.

Despite offering no such description for the jury in his expert report, Dr.

Adanur admitted that Defendants' proposed construction was neither inaccurate

25

nor incorrect, but that it merely failed to also include the height of the fabric (8 inches) and the machine to be used for the test. (Ex. 2, 271:19 – 272:17).

In short, Dr. Adanur admitted that ASTM D-4632 is a test that (1) calculates the breaking load; (2) calculates the breaking load by averaging the values for all of the excepted test specimens; and (3) calculates the average without removing one or more standard deviations.  (Ex. 2, 238:16 – 240:15)

Dr. Adanur's concessions support Defendants' proposed construction: "*ASTM D-4632* is a published standard test method for grab breaking load and elongation of geotextiles to determine the effective strength of a fabric using 4-inch wide fabric specimens that are gripped and pulled by jaws. The breaking load for multiple specimens is measured, and the average of the test values is used, without subtracting any standard deviation(s)."

> **3.    Disputed Claim Term No. 10 – "the reinforced silt retention sheet … has an *ultimate tensile strength ranging from about 100 lbs to 350 lbs in the warp direction*" (Claims 20, 24, 28 & 31)**
>
> **4.    Disputed Claim Term No. 11 – "the reinforced silt retention sheet … has an *ultimate tensile strength ranging from about 75 lbs to 450 lbs in the fill direction*" (Claims 20, 24, 28 & 31)**

| Plaintiff's Proposed Construction | Defendants Proposed Construction |
| --- | --- |
| No construction is necessary as all terms in the phrase have an ordinary meaning other than "ultimate tensile strength" for which Silt Saver has proposed a definition.  ASTM D- | The ASTM D-4632 test procedure (as construed above) is performed with a reinforced portion of the fabric centered in the jaws of the test fixture, and the average of the test values is used without |

| 4632 is not within the claim language. | subtracting any standard deviation(s). |
|---|---|

These two terms can be construed together, because the only difference is the direction of the test (warp versus fill direction), and the parties have agreed to the construction of the terms "warp direction" and "fill direction".  (Doc. 61)

The fact that the claim language recites that the **reinforced** silt retention sheet has specified ultimate tensile strengths dictates that the strengths must be measured at the **reinforced** portion of the silt retention fence.  Plaintiff's expert admitted this when he testified (Ex. 2, 233:21 – 234:5):

> Q.   […] Sitting here today, reading it, as one skilled in the art, when it says, "Wherein, the reinforced silt retention sheet has an ultimate tensile strength ranging from about 100 pounds to 350 pounds in the warp direction," that actually would lead you to believe that it should be any testing should be done at the reinforced area?
>
> A.   Just reading the language in the claim, yes.

It is common sense that the ultimate tensile strength must be measured at a **reinforced** portion of the silt retention sheet; otherwise, the word "reinforced" would be read out of the claim.

The Specification and Prosecution History confirm that tensile strength is measured using the ASTM D-4632 standard test.  As to testing in the **warp** direction, the Specification states:  "The reinforced silt retention fabric generally

may have a tensile strength of at least about 100 lb in the warp (machine) direction ('warp tensile strength'), <u>as measured according to ASTM D-4632</u>."  (Ex. 1, col. 12, lines 31-34; emphasis added).   As to testing in the **fill** direction, the Specification states:  "The reinforced silt retention fabric generally may have a tensile strength of at least about 75 lb in the fill (cross machine) direction ('fill tensile strength'), <u>as measured according to ASTM D-4632</u>." (Ex. 1, col. 12, lines 45-48; emphasis added).

This is further confirmed in the Specification, where it describes testing performed on the invention against the relevant prior art. Table 3 is depicted below showing that the testing was performed according to ASTM D-4632:

TABLE 3-continued

|  | Sample W | Sample S |
|---|---|---|
| Source | Willacoochee Industrial Fabrics (Willacoochee, GA) | Silt-Saver, Inc. (Conyers, GA) |
| Basis weight (osy) | 6.2 | 3.0 |
| Thickness (mm) | Not tested | 0.4 mm |
| Grab tensile (lb) (ASTM D-4632) | Warp (machine direction) - 300 Fill (cross direction) - 200 | Warp (machine direction) - 124 Fill (cross direction) - 88 |

Dr. Brookstein's report (Doc. 50, ¶ 147) describes and illustrates how one skilled in the art would conduct the ASTM D-4632 test on a reinforced silt retention sheet as disclosed in the Specification.  (Reproduced in Exhibit 11)

Plaintiff's position that "ASTM D-4632 is not within the claim language" begs the question; how is an "ultimate tensile strength" test to be performed to determine whether an accused product reads on this claim element?  Further, there

28

is no mention of any other "ultimate tensile strength" test in the Specification or Prosecution History; so what test is to be used?   "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."   *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120, 2124 (2014).

Applying Plaintiff's proposed construction, because ASTM D-4632 is "unmentioned," means these claims are indefinite under 35 U.S.C. § 112, which requires that a patent "shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his or her invention."   Absent some method for determining an "*ultimate tensile strength ranging from about 100 lbs to 350 lbs in the warp direction* [*about 75 lbs to 450 lbs in the fill direction*]," these terms are indefinite.   In particular, where (as here), a claim has a numerical limitation, but the patent does not disclose which of multiple known methods of measuring that number should be used, the claim is indefinite.   *Honeywell Intern., Inc. v. International Trade Comm'n*, 341 F.3d 1332, 1340 (Fed. Cir. 2003); *see also Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1341 (Fed. Cir. 2003) (claims cannot be a "moving target").

As set forth above, Plaintiff's expert conceded that:  (1) ultimate tensile strength must be measured at a **reinforced** portion of the sheet (Ex. 2, 233:21 – 234:5); (2) when the patentee described "tensile strength" in the Specification, he described it as "measured according to ASTM D-4632" (Ex. 2, 217:25 – 218:4); (3) the <u>only</u> test method for tensile strength discussed in the Specification is ASTM D-4632  (Ex. 2, 219:4-8); (4) one skilled in the art in 2002 would have understood that the generally accepted test for grab tensile strength in the United States was ASTM D-4632 (Ex. 2, 219:21 – 220:25); and (5) when performing the ASTM D-4632 test, calculating the average breaking load does not require removing one or more standard deviations.  (Ex. 2, 238:16 – 240:15)  Accordingly, Defendants' proposed construction should be adopted.

> **5.** **Disputed Claim Term No. 13 – "said reinforced silt retention sheet has … *a mullen burst strength ranging from about 150 to 450 lbs per square inch*" (Claim 31)**

| Plaintiff's Proposed Construction | Defendants Proposed Construction |
|---|---|
| No claim construction is required. Neither ASTM D-3786 or testing the reinforcing element of the fabric are in the claim. | ASTM D-3786 is a published standard test method for bursting strength of textile fabrics, which measures the resistance of textile fabrics to bursting using a hydraulic or pneumatic diaphragm bursting tester. The ASTM D-3786 test procedure is performed on a reinforced portion of the fabric. |

The Specification confirms that mullen burst strength is measured using the ASTM D-3786 standard test:  "The reinforced silt retention fabric generally may have a mullen burst strength at least about 150 psi, <u>as measured according to ASTM D-3786</u>."  (Ex. 1, col. 13, lines 28-30; emphasis added)  This is also confirmed in Table 3 of the Specification.

Plaintiff's expert admitted that if one skilled in the art were to read the term "mullen burst strength" they would assume that the mullen burst reference was to ASTM D-3786. (Ex. 2, 244:23 - 245:3)

With respect to the limitation that the mullen burst strength must be tested on a *reinforced* portion of the fabric, this is clear from the language of the claim itself:  "**said reinforced silt retention sheet** has … a *mullen burst strength ranging from about 150 to 450 lbs per square inch*."  (Claim 31; emphasis added.) Accordingly, Defendants' proposed construction should be adopted.

## C.    Additional Disputed Terms

### 1.    Disputed Claim Term No. 7 – "*arranged spaced*" (Claim 1)

| Plaintiff's Proposed Construction | Defendants Proposed Construction |
| --- | --- |
| No construction is necessary as the phrase has an ordinary meaning. Should the Court determine to construe this term, it should be construed to mean: "separated in an ordered way." | Indefinite. |

The term "*arranged spaced*" cannot be found in the Specification.  The term was added during prosecution in response to an Office Action rejecting the relevant claim.  In response, the patentee amended the claim to add the word "arranged" before "spaced":

> 8.  (currently amended) […]
>
> a reinforcing material <u>extending along the nonwoven fabric and adapted to support and</u> ~~to~~ prevent ripping and tearing of the silt retention sheet secured within the entangled polymer fibers without substantially being bonded thereto, the reinforcing material or element being **<u>arranged</u> spaced** in non-overlapping intervals in the warp and/or fill direction <u>of the nonwoven fabric</u>, […]

(Exhibit 12, June 10, 2008 Response to Official Action, p. 2; underscore/strikethrough in original, showing additions/deletions; bold added)

Contrary to the "arranged spaced" language appearing in the amended claim, in the remarks accompanying this claim amendment, the patentee argued:

> Additionally, as illustrated in Figs. 2, 3 and 4, the reinforcing material (32) of *Stevenson* appears to extend across the entire length and width of the geocomposite, rather than teaching a reinforcement that is ***spaced or arranged*** at non-overlapping intervals across or along a non-woven fabric material.

(Ex. 12, p. 9; emphasis added)

The phrase "spaced or arranged" used in the patentee's remarks does not match the term "arranged spaced" recited in Claim 1, and it is evident that "arranged spaced" is a typographical error.  A district court can correct a patent only if (1) the correction is not subject to reasonable debate based on consideration

of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims. *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003)

Plaintiff's expert, in his report, wrote that "arranged spaced" was "not [a term] of art with a specific definition in the textile or fabric industry." (Doc. 49, ¶ 32) If it is not a term of art in the industry and not defined in the specification, there is no support for any construction. As explained by Defendants' expert:

> It is my opinion that one of ordinary skill in the art would not be able to know what the term "arranged spaced" means in view of the disclosures recited in the '695 patent. As such it is my opinion that this term is "indefinite". Further, it is my opinion that this term would not be recognized by either one of ordinary skill in the art or textile industry practitioners. (Doc. 50, ¶ 162)

Accordingly, this term is subject to reasonable debate under *Novo Indus.*, and "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, supra.* Therefore, Claim 1 is indefinite.

## 2. Disputed Claim Term No. 3 – *"arranged above ground"* (Claims 1 & 23)

| Plaintiff's Proposed Construction | Defendants Proposed Construction |
|---|---|
| The preamble is a limitation, but no construction is necessary. | This is a limitation to Claims 1 and 23, and means that the reinforced silt retention sheet is "installed above ground for use in a silt management application." |

The parties agree that the preamble is a limitation to Claims 1 and 23 but disagree on whether this term needs to be construed.  Defendants propose: "installed above ground for use in a silt management application," as described in the Specification.  For the reinforced silt retention sheet to be useful, it must be installed above ground to "enable filtering of a flow of fluid passing through the reinforced silt retention sheet."  (Ex. 1, Abstract)

Defendants' proposed construction is taken directly from the intrinsic record.  In response to an Office Action, the patentee described the invention:

> Applicant has amended independent claim 8 to include the limitations that the reinforced silt retention sheet "arranged above ground, for use in a silt management application" [… ]
>
> Applicant's amended claim 8 further teaches a silt retention sheet for use "above ground, in a silt management application."  [… ]

(Exhibit 13, October 30, 2007 Response to Office Action, pp. 8-9)

Plaintiff's expert's only objection to Defendants' proposed construction is that it could mean that no portion of the fence could be installed below ground. (Ex. 2, 248:9-25)  Defendants' proposed construction was not intended to be so limiting and the Court could make that clear in its construction, if necessary.

### 3.   Disputed Claim Term No. 5 – *"reinforcing material or element"* (Claim 1)

| Plaintiff's Proposed Construction | Defendants Proposed Construction |
|---|---|
| No construction is necessary as each | "material or element that is capable of |

| term has an easily understood ordinary meaning. | enhancing the strength or puncture resistance of the fabric" |

The "*reinforcing material or element*" is separately recited from the "*entangled polymer fibers*" of the "fabric" in Claim 1.

The Specification describes the "*reinforcing material or elements*" as:

> The silt retention sheet further includes one or more <u>reinforcing elements, strips, or belts attached to the web at spaced intervals along or across the width of the web</u>. (Ex. 1, col. 2, lines 15-18)

> In this and other aspects of the present invention, the silt retention material may include one or more reinforcing elements. <u>The reinforcing material or element may be any suitable construct or element (collectively "elements") that is capable of enhancing at least one of the tensile strength, burst strength, puncture resistance, tear strength, or the like, of the woven or nonwoven material</u>. (Ex. 1, col. 6, lines 54-60; emphasis added)

The Specification makes clear that the "reinforcing material or element" is a separate feature capable of enhancing one or more capabilities of the base fabric, including tensile <u>strength</u>, burst <u>strength</u>, <u>puncture resistance</u>, tear <u>strength</u> or the like, "as need or desired for a particular application."

Accordingly, Defendants' proposed construction should be adopted.

Respectfully submitted, this 8th day of May, 2017.

PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP

By:  */s/ Eric G. Soller*
Eric G. Soller, Esquire (admitted *pro hac vice*)
One Oxford Centre
The Thirty-Eighth Floor
Pittsburgh, PA 15219
(412) 263-2000
EGS@Pietragallo.com

LEECH TISHMAN FUSCALDO & LAMPL LLC
Alan G. Towner, Esquire (admitted *pro hac vice*)
525 William Penn Place
28th Floor
Pittsburgh, PA  15219
(412) 261-1600
atowner@LeechTishman.com

KILPATRICK TOWNSEND & STOCKTON LLP
Audra Dial, Esquire
1100 Peachtree Street NE
Suite 2800
Atlanta, GA  30309-4528
(404) 815-6307
adial@kilpatricktownsend.com

*Counsel for Defendants*

## <u>LOCAL RULE 7.1 COMPLIANCE CERTIFICATE</u>

I hereby certify that the foregoing DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF, was prepared using the Times New Roman 14-point font, and otherwise conforms to the requirements of Local Rule 5.1 and 7.1D.

This 8th day of May, 2017.

*/s/ Eric G. Soller*        
Eric G. Soller, Esquire (admitted *pro hac vice*)
PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP
One Oxford Centre
The Thirty-Eighth Floor
Pittsburgh, PA 15219
(412) 263-2000
egs@pietragallo.com

*One of the Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 8th day of May, 2017, I electronically filed the foregoing

DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF with the Clerk of

Court using the CM/ECF system which will automatically send email notification

of such filing to the following attorneys of record for Plaintiff.

Kirk W. Watkins
DAVIS, ZIPPERMAN, KIRSCHENBAUM & LOTITO, LLP
918 Ponce de Leon Avenue, NE
Atlanta, Georgia  30306
<u>kwatkins@dzkl.com</u>

D. Scott Sudderth
WOMBLE CARLYLE SANDRIDGE & RICE, LLP
271 17th Street NW, Suite 2400
Atlanta, Georgia 30363
<u>ssudderth@wcsr.com</u>

/s/ *Eric G. Soller*
Eric G. Soller, Esquire (admitted *pro hac vice*)
PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP
One Oxford Centre
The Thirty-Eighth Floor
Pittsburgh, PA 15219
(412) 263-2000
egs@pietragallo.com

*One of the Attorneys for Defendants*